THE VILLAGE OF DEERFIELD, Plaintiff-Appellant, v. COMMONWEALTH EDISON COMPANY, Defendant-Appellee.

Second District No. 2—08—0917

Opinion filed December 15, 2009.—Supplemental opinion filed on denial of rehearing March 30, 2010.

Peter D. Coblentz, of Rosenthal, Murphey, Coblentz & Donahue, and Norman T. Finkel and Richard M. Goldwasser, both of Schoenberg, Finkel, Newman & Rosenberg, LLC, both of Chicago, for appellant.

Barry Levenstam, Gabriel A. Fuentes, and Erinn L. Wehrman, all of Jenner & Block, LLP, of Chicago, for appellee.

JUSTICE HUDSON delivered the opinion of the court:

Plaintiff, the Village of Deerfield, appeals an order of the circuit court of Lake County dismissing its three-count complaint against defendant, Commonwealth Edison Company (ComEd). Plaintiff asserts that the trial court erred in dismissing the first and third counts of its complaint, and it abandons count II. Count I, which it titled "Breach of Contract," alleges that chronic electrical outages occurred within the village as a result of various breaches of ComEd's duties under a "Franchise Agreement." Its prayer for relief requests the appointment of "an independent receiver during the pendency of this litigation to act on behalf of the Court for purposes of monitoring actions by [ComEd] to eliminate breaches and to periodically report to the Court as to the status of such actions"; an award of attorney fees and costs; and other relief that the court deems appropriate. Count III is titled "Civil Damages for Violation of Public Utilities Act." This count alleges the existence of a statutory duty and a willful violation of that duty. Count III seeks class-action certification for all customers located within the village. It alleges that potential class members have suffered damages such as "spoiled food, purchase of electric generators to deal with [ComEd's] unreliable service, property damage,

temporary housing, [and] extra municipal and policing services." As relief, it requests monetary damages exceeding $50,000, punitive damages, attorney fees and costs, and whatever other relief the court finds proper.

The trial court dismissed plaintiff's complaint with prejudice. It determined that the Illinois Commerce Commission (Commission) had exclusive jurisdiction over this dispute. It also found that the third count was barred by the *Moorman* doctrine. See *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 91 (1982) (holding that a "plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation"). Plaintiff timely appealed the trial court's decision. While we disagree with the trial court's determination that it lacked jurisdiction over the subject matter of this dispute, we agree with ComEd's contention that the court should defer to the Commission in accordance with the doctrine of primary jurisdiction. Further, regarding count III, we hold that some, but not all, of the relief requested is barred by *Moorman*. We will first turn to the jurisdictional question. Our review of a trial court's grant of a motion to dismiss is *de novo*. *Freeman v. Williamson*, 383 Ill. App. 3d 933, 936 (2008).

The initial question we face concerns the determination of whether the relief plaintiff seeks implicates rates. This is because the Commission has "exclusive jurisdiction over complaints of excessive rates or overcharges by public utilities[ ] and courts have jurisdiction over those matters only on administrative review." *Village of Evergreen Park v. Commonwealth Edison Co.*, 296 Ill. App. 3d 810, 813 (1998); see also *City of Chicago v. Thrasher*, 159 Ill. App. 3d 1076, 1079-80 (1987). Plaintiff questions the vitality of this proposition in light of the changes that were made to the Illinois Constitution in the 1960s. We need not address this contention, since we ultimately hold that plaintiff's complaint does not implicate rates.

We will first set forth the applicable law. ComEd argues that the Commission has exclusive jurisdiction over the instant case by virtue of section 9—252 of the Public Utilities Act (Act) (220 ILCS 5/9—252 (West 2008)). That section provides, in pertinent part:

> "When complaint is made to the Commission concerning any rate or other charge of any public utility and the Commission finds, after a hearing, that the public utility has charged an excessive or unjustly discriminatory amount for its product, commodity or service, the Commission may order that the public utility make due reparation to the complainant therefor, with interest at the legal rate from the date of payment of such excessive or unjustly discriminatory amount.

\*\*\*

All complaints for the recovery of damages shall be filed with the Commission within 2 years from the time the produce, commodity or service as to which complaint is made was furnished or performed, and a petition for the enforcement of an order of the Commission for the payment of money shall be filed in the proper court within one year from the date of the order, except that if an appeal is taken from the order of the Commission, the time from the taking of the appeal until its final adjudication shall be excluded in computing the one year allowed for filing the complaint to enforce such order." 220 ILCS 5/9—252 (West 2008).

This provision has indeed been construed to vest the Commission with exclusive jurisdiction over claims that rates are excessive or unjustly discriminatory. *Village of Roselle v. Commonwealth Edison Co.*, 368 Ill. App. 3d 1097, 1104 (2006); *Village of Evergreen Park*, 296 Ill. App. 3d at 813.

Plaintiff, on the other hand, points to the following portion of section 5—201 of the Act, which states:

"In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment. *An action to recover for such loss, damage or injury may be brought in the circuit court by any person or corporation.*" (Emphasis added.) 220 ILCS 5/5—201 (West 2008).

This provision places within the jurisdiction of the circuit court matters not pertaining to excessive or unjustly discriminatory rates, over which the Commission has exclusive jurisdiction. *Village of Roselle*, 368 Ill. App. 3d at 1109.

We must therefore determine whether the trial court's characterization of plaintiff's complaint as pertaining to rates was correct. We find considerable guidance for the resolution of this issue in *Flournoy v. Ameritech*, 351 Ill. App. 3d 583 (2004). In that case, the plaintiff, an inmate at the Joliet Correctional Center, sued Ameritech, alleging that the company deliberately terminated his collect calls shortly after they were accepted. Under the applicable fee structure, anyone who accepted a collect call was subject to an initial fee. Ameritech's alleged practice forced the plaintiff to make subsequent calls, which were

again subject to the initial fee. His complaint alleged fraud and negligence. The *Flournoy* court first set forth the controlling law:

"In determining whether an action falls within the exclusive jurisdiction of the Commission, courts have consistently focused on the nature of the relief sought rather than the basis for seeking relief. [Citations.] If the plaintiff's action is for reparations, the Commission has exclusive jurisdiction. However, if the action is for civil damages, then the circuit court may hear the case. [Citations.]

A claim is for reparations when the essence of the claim is that a utility has charged too much for a service. [Citations.] In contrast, a claim is for ordinary civil damages when the essence of the claim is not that the utility has excessively charged but, rather, that the utility has done something else to wrong the plaintiff. [Citations.]" *Flournoy*, 351 Ill. App. 3d at 585.

The court found that the plaintiff's claim was within the trial court's jurisdiction, explaining that the plaintiff did not "contest the actual rates charged as surcharges and initial calling fees, or claim those rates [were] excessive." *Flournoy*, 351 Ill. App. 3d at 586. Rather, the plaintiff's "claim is that Ameritech collected the charges multiple times due to its practice of prematurely terminating his collect calls." *Flournoy*, 351 Ill. App. 3d at 586. We note that the plaintiff's claim in *Flournoy* involved how Ameritech rendered services to him.

Another case we find relevant is *Gowdey v. Commonwealth Edison Co.*, 37 Ill. App. 3d 140 (1976). The *Gowdey* court was confronted with a situation where ComEd included within its billing to certain customers a "light bulb service." This service was supposed to be optional, but ComEd operated upon the assumption that its residential customers wanted the service. Their bills therefore included a charge for it. ComEd moved to dismiss, arguing that the circuit court lacked jurisdiction. The appellate court began with the recognition that the Commission has jurisdiction over claims concerning excessive rates. *Gowdey*, 37 Ill. App. 3d at 147. The court noted that the plaintiffs did not object to the "fairness of the light bulb service charge," which, it stated, was quite reasonable. *Gowdey*, 37 Ill. App. 3d at 148. Absent a challenge to the rate itself, the circuit court had jurisdiction over the case. *Gowdey*, 37 Ill. App. 3d at 149. Thus, even where a complaint involves an actual charge on a customer's bill, the Commission does not have exclusive jurisdiction unless the basis of the complaint is that the charge is excessive or discriminatory. See also *Roselle*, 368 Ill. App. 3d at 1109 ("Since the essence of the Village's claim is not that ComEd has overcharged, it necessarily involves allegations that ComEd 'has done something else to wrong the plaintiff.' [Citation.] Therefore, we conclude that the Village's claim was properly filed in the circuit court").

■ Given the foregoing precedent, we conclude that the circuit court did have jurisdiction over plaintiff's claims. Plaintiff's complaint does not allege excessive or discriminatory rates. Rather, it alleges deficient performance by ComEd, which it attacks through a number or theories (contract, tort, violation of the Act). Generally, the question of jurisdiction turns on the nature of the relief sought; if a plaintiff seeks ordinary civil damages, the court system has subject matter jurisdiction over the case. *Thrasher*, 159 Ill. App. 3d at 1079-80. Here, the relief sought is clearly not reparations for an illegal rate, so the circuit court had jurisdiction.

We note that in concluding that it lacked jurisdiction, the trial court relied on a pair of federal cases: *Bastien v. AT&T Wireless Services, Inc.*, 205 F.3d 983 (7th Cir. 2000), and *Technical Loss Services, Inc. v. American Telephone & Telegraph Co.*, 138 F. Supp. 2d 1075 (N.D. Ill. 2001). Although decisions of the Seventh Circuit Court of Appeals are not binding upon this court, they may be persuasive—if well reasoned. *People v. Sequoia Books, Inc.*, 145 Ill. App. 3d 1054, 1062 (1986). We initially note, however, that the persuasive value of *Bastien* is undermined somewhat by the fact that the Seventh Circuit was not interpreting the Act; rather, it was considering two federal statutory provisions. *Bastien*, 205 F.3d at 987. Nevertheless, the District Court for the Northern District of Illinois did rely on *Bastien*'s reasoning when interpreting the Act. *Technical Loss Services, Inc.*, 138 F. Supp. 2d at 1078 (citing *Bastien* and holding a "complaint about the quality of [the] service [received] may be recast as a complaint that the service was not worth the rates charged"). That reasoning is as follows:

> "In practice, most consumer complaints will involve the rates charged by telephone companies or their quality of service. See *American Telephone & Telegraph Co. v. Central Office Telephone*, 524 U.S. 214, 223, 141 L. Ed. 2d 222, 233-34, 118 S. Ct. 1956, 1963 (1998) ('Any claim for excessive rates can be couched as a claim for inadequate services and vice versa'). As the Supreme Court recognized in *Central Office Telephone*, a complaint that service quality is poor is really an attack on the rates charged for the service and may be treated as a federal case regardless of whether the issue was framed in terms of state law." *Bastien*, 205 F.3d at 988.

The context of the rule ComEd seeks to rely upon is essential to understanding it; hence, we must look to the case upon which the Seventh Circuit relied.

■ In *Central Office Telephone*, the issue before the Supreme Court was whether the "filed-rate doctrine" preempted certain actions based

on state law. *Central Office Telephone*, 524 U.S. at 221, 141 L. Ed. 2d at 232, 118 S. Ct. at 1962. The full passage from *Central Office Telephone* to which *Bastien* cites reads as follows:

> "Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa. 'If "discrimination in charges" does not include non-price features, then the carrier could defeat the broad purpose of the statute by the simple expedient of providing an additional benefit at no additional charge.... An unreasonable "discrimination in charges," that is, can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price.' *Competitive Telecommunications Ass'n v. FCC*, 998 F.2d 1058, 1062 (CADC 1993)." *Central Office Telephone*, 524 U.S. at 223, 141 L. Ed. 2d at 233-34, 118 S. Ct. at 1963.

In this passage, the Supreme Court was speaking of what constitutes "discrimination in charges." The Court described the filed-rate doctrine as a policy of nondiscrimination that is "violated when similarly situated customers pay different rates for the same services." *Central Office Telephone*, 524 U.S. at 223, 141 L. Ed. 2d at 233, 118 S. Ct. at 1963. It noted that the lower court whose ruling it was reviewing had held that the filed-rate doctrine was not implicated in the case, because the case did not involve the setting of rates but the provision of services. *Central Office Telephone*, 524 U.S. at 223, 141 L. Ed. 2d at 233, 118 S. Ct. at 1963. The Court's observation that "[a]ny claim for excessive rates can be couched as a claim for inadequate services and vice versa" must be read in that context. The Court was simply making the rather straightforward observation that a rate scheme can be discriminatory if different prices are charged for the same services or if different services are provided for the same price. This proposition is very different from the one for which the trial court in this case cited *Bastien* and *Technical Loss Services, Inc.*, namely, that in all circumstances, complaints about the quality of service are, in fact, complaints about rates.

Indeed, and by way of analogy, that proposition is at odds with the manner in which we generally evaluate commercial transactions. Consider the following hypothetical. If one contracts for an automobile worth $20,000, a dealer cannot perform by tendering an automobile worth $15,000 and also tendering $5,000. That would be a breach of the contract. Similarly, a utility customer presumably does not want substandard service at a reduced rate; the customer wants the service it requested at the price that was agreed upon. The fact that rates or price may be adjusted downward after the fact in no way cures

substandard performance. *Cf.* 810 ILCS 5/2—508 (West 2008) (seller of nonconforming shipment of commercial goods may cure by making a conforming shipment; statute contains no provision requiring buyer to accept tender of money representing diminution of value of goods).

We have no quarrel with the Seventh Circuit's proposition regarding complaints about services being, in essence, complaints about rates in the context that the Seventh Circuit was considering it. However, upon closer scrutiny, the proposition has no relevance to the issue presented in this case. Accordingly, we hold that the trial court erred in characterizing plaintiff's complaint as pertaining to rates. Moreover, since the complaint does not pertain to rates, it does not fall within the exclusive jurisdiction of the Commission. As circuit courts are courts of general jurisdiction (*Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 529-30 (2001)) and the legislature has divested the court system of matters pertaining only to excessive or discriminatory rates (*Village of Evergreen Park*, 296 Ill. App. 3d at 813), the circuit court did have jurisdiction over this case.

■ This conclusion, however, does not end our analysis. ComEd asserts that the court system should defer to the Commission pursuant to the doctrine of primary jurisdiction. Strictly speaking, this doctrine is not truly jurisdictional; rather, it concerns the orderly relationship between administrative and judicial decision making. *Peoples Energy Corp. v. Illinois Commerce Comm'n*, 142 Ill. App. 3d 917, 931 (1986). The doctrine holds that a court, despite having subject matter jurisdiction over a matter, should, in certain circumstances, stay a judicial proceeding "pending referral of a controversy, or some portion of it, to an administrative agency having expertise in the area." *Employers Mutual Cos. v. Skilling*, 163 Ill. 2d 284, 288 (1994). Such circumstances are when an agency possesses specialized expertise that would aid in the resolution of a controversy or when a need exists for uniform administrative standards. *Kellerman v. MCI Telecommunications Corp.*, 112 Ill. 2d 428, 445 (1986). Both circumstances exist in the present case.

■ Regarding the first, we believe that the expertise of the Commission would be of great assistance in resolving this matter. In plaintiff's first count, for example, it alleges that ComEd failed to "take all reasonable and necessary steps to assure an adequate supply of electricity to Deerfield." This allegation goes to the very heart of what it means to operate a utility. Moreover, plaintiff also alleges that ComEd "has failed to make such enlargements and extensions of its distribution facilities as are necessary to adequately provide" electrical service to plaintiff and its residents. The Commission, not the court system, is the appropriate place to address whether ComEd is

required to build or expand its facilities. Similarly, the third count alleges that ComEd failed to perform its obligations under the Act to "provide service and facilities which are in all respects adequate, efficient, reliable, and environmentally safe." Attached to the complaint are a number of technical documents. We can barely conceive of a more appropriate case for the invocation of the primary-jurisdiction doctrine. Cf. *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523 (1960) (in discussing the standard of review, the court noted the expertise of the Commission: "Indeed, it has long been established that in matters relating to services and rates of utilities technical data and expert opinion, as well as complex technological and scientific data, make it essential that the matter be considered by a tribunal that is itself capable of passing upon complex data").

Plaintiff cites *Kellerman*, 112 Ill. 2d 428, and asserts, "As in *Kellerman*, plaintiff here has alleged common law and statutory violations— standard fare for judges." While the overarching legal theories may be similar, the substance of the respective actions is very different. In *Kellerman*, the issue was whether the defendant's advertising that described its service charges was fraudulent. *Kellerman*, 112 Ill. 2d at 434. For example, the plaintiffs alleged that the defendant, a telephone company, did not disclose its practice to charge for calls that were not completed. *Kellerman*, 112 Ill. 2d at 436. While this may have required some evidence as to the usual practices of the telecommunications industry, nowhere in *Kellerman* is there any indication that knowledge regarding the technical operation of the telephone system would have been helpful. In this case, conversely, plaintiff's complaint directly places at issue how ComEd operates its electrical system. *Kellerman* is thus easily distinguishable.

We also hold that the need for uniform administrative standards makes deference appropriate. In *Peoples Gas Light & Coke Co. v. City of Chicago*, 125 Ill. App. 3d 95, 101 (1984), this need was recognized, albeit in the legislative and regulatory context:

> "We find that our State legislature and the courts of this State long ago recognized the overriding need for uniform, comprehensive utility regulation by vesting exclusive regulatory jurisdiction over this area in a single regulatory agency. Permitting every home rule unit in this State to regulate in this field would subject utilities to multiple and sometimes conflicting governmental requirements which could only result in confusion and would seriously disrupt the regulatory scheme now in place."

Similarly, allowing courts to pass on questions such as those raised by plaintiff in this case, on a piecemeal basis without input from the Commission, would severely hamper the Commission's ability to apply

consistent standards throughout the state. Indeed, this court has stated, " '[I]t is rather difficult to conceive of a subject which more requires uniform regulation at a high and broad level of authority than the method of transmission of electric power.' " *Commonwealth Edison Co. v. City of Warrenville*, 288 Ill. App. 3d 373, 379 (1997), quoting *In re Public Service Electric & Gas Co.*, 35 N.J. 358, 373, 173 A.2d 233, 240-41 (1961). Accordingly, the need for uniform standards favors allowing the Commission to consider this case. We therefore hold that the circuit court should stay further proceedings, though retaining jurisdiction, so that the Commission may consider this matter.

●5 We also provide the following guidance regarding how the trial court should proceed on remand. The application of the doctrine of primary jurisdiction in most cases does not require that a trial court dismiss a cause. See *People v. NL Industries*, 152 Ill. 2d 82, 95 (1992). It "does not require complete withdrawal by the court," but "merely delays the exercise of power by the court." *Metropolitan Sanitary District of Greater Chicago v. United States Steel Corp.*, 30 Ill. App. 3d 360, 367 (1975). The purpose of the doctrine is to permit an agency to first examine a controversy where the agency's "specialized expertise [will] presumably be brought to bear upon the situation" to give the court the benefit of that expertise. *Metropolitan Sanitary District of Greater Chicago*, 30 Ill. App. 3d at 367. It has been observed that "The exercise of this doctrine follows no fixed formula; in each case the issue is whether the underlying reasons for the doctrine exist and whether its purposes will be aided by its being employed in such case." *Chicago & Eastern Illinois R.R. Co. v. Martin Brothers Container & Timber Products Corp.*, 87 Ill. App. 3d 327, 334 (1980). Thus, upon staying the proceedings, the trial court should refer, at a minimum, to those portions of the case identified in this opinion either that implicate the expertise of the Commission or for which uniform standards are appropriate. In addition, the trial court should refer any other portions of the proceedings sharing either of these characteristics and any further issues it deems appropriate. After the Commission has had an opportunity to pass upon these matters, the court may engage in whatever further proceedings are proper.

During oral argument, a question arose regarding the impact of a limitations period on this case after it is referred to the Commission. Plaintiff was understandably concerned that if it had to refile the action with the Commission, it would be unable to reach some of the earlier conduct and damages alleged in its complaint. We will not prejudge the issue of the Commission's jurisdiction or the potential effect of any applicable limitations periods. Further, we will not assume

that the Commission will apply any limitations period in a manner that is unjust to plaintiff. Indeed, this is a question for the Commission to resolve. We recognize that time limitations on initiating administrative proceedings are generally considered to be jurisdictional. *Reilly v. Wyeth*, 377 Ill. App. 3d 20, 33-34 (2007). However, we also recognize that there is some narrow authority that allows such limitations to be disregarded. See *Pickering v. Human Rights Comm'n*, 146 Ill. App. 3d 340, 348 (1986). We further note that the continuing-violation doctrine has been applied in the administrative context. See *Graves v. Chief Legal Counsel of the Department of Human Rights*, 327 Ill. App. 3d 293, 298-99 (2002); *Trembczynski v. Human Rights Comm'n*, 252 Ill. App. 3d 966, 970 (1993). Moreover, we are aware of nothing that restricts an administrative agency, unlike a court, from rendering an advisory opinion. See *Federal Communications Comm'n v. Pacifica Foundation*, 438 U.S. 726, 734-35, 57 L. Ed. 2d 1073, 1084, 98 S. Ct. 3026, 3033 (1978) ("However appropriate it may be for an administrative agency to write broadly in an adjudicatory proceeding, federal courts have never been empowered to issue advisory opinions"); *Pacesetter Homes, Inc. v. Village of Olympia Fields*, 104 Ill. App. 2d 218, 223 (1968). Since the trial court will retain jurisdiction, it can fashion an appropriate order granting the relief, if warranted and beyond the reach of the Commission, that plaintiff seeks. In any event, even if the Commission addresses only conduct occurring within a limitations period, its resolution of those issues will likely be of help to the trial court in addressing the earlier conduct.

 Our resolution of the first issue makes it necessary for us to consider whether plaintiff's third count is barred by the *Moorman* doctrine. The *Moorman* doctrine (also known as the economic-loss doctrine) bars the recovery of damages for purely economic losses in a tort action, relegating such claims to the realm of contract law. *Moorman*, 91 Ill. 2d at 86. In count III, plaintiff seeks recovery for the following: "property damage, spoilage of food, costs for clean-up and mold remediation due to flooded basements, costs for temporary housing during outages, and purchase of back up generators and battery powered sump pumps." Some, but not all, of these damages are barred by *Moorman*.

In determining whether damages constitute purely economic losses, the following principles are relevant. Economic losses have been defined to include " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property.' " *Moorman*, 91 Ill. 2d at 82, quoting Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 918 (1966).

An additional example of economic loss is " 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' " *Moorman*, 91 Ill. 2d at 82, quoting Comment, *Manufacturers' Liability to Remote Purchasers for 'Economic Loss' Damages—Tort or Contract?*, 114 U. Pa. L. Rev. 539, 541 (1966). In *Loman v. Freeman*, 375 Ill. App. 3d 445, 456 (2006), the court explained, "In contrast to a contractual claim, which alleges only economic damages or disappointed commercial expectations, a tort claim alleges the infliction of personal injury or property damage by a sudden or dangerous occurrence." "Property damage" refers to damage to property other than the defective product itself. *Loman*, 375 Ill. App. 3d at 456. In this case, the trial court found that the damages plaintiff alleged did not occur as a result of a "sudden or dangerous occurrence."

We disagree to an extent. It appears to us that the trial court interpreted the term "sudden or dangerous occurrence" too narrowly. We first note that plaintiff alleges food spoilage. In *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 201 (1997), our supreme court expressly held:

> "The trial court ruled that the economic loss rule does not bar recovery in tort for those plaintiffs who lost perishable inventory as a result of interrupted electrical service. The appellate court affirmed. We agree."

Thus, in accordance with the supreme court's clear holding, this portion of plaintiff's claim is not barred by *Moorman*. Similarly, plaintiff's claims for "costs for clean-up and mold remediation due to flooded basements" involve actual physical damages to property, so they are recoverable.

As for plaintiff's allegation that it suffered "property damage," we can say only that it is too indefinite for us to determine whether *Moorman* applies. We note that, when encountering a similar allegation in *In re Chicago Flood Litigation*, 176 Ill. 2d at 202, our supreme court stated, "The conclusory allegation of unspecified property damage is insufficient to show that their damages are recoverable in tort, and cannot withstand a motion to dismiss." We do not believe that this would foreclose plaintiff from setting forth damages with more specificity, if it can. As this allegation is currently written, though, it states nothing for which plaintiff can recover.

Plaintiff also seeks recovery for "costs for temporary housing during outages, and purchase of back up generators and battery powered sump pumps." These are purely economic losses. The purchase of generators and battery-operated sump pumps strikes us as very similar to the concept of "cover" in commercial law. See 810 ILCS 5/2—712(1),

(2) (West 2008) ("After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller"; the buyer may then "recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages"). In essence, by making these acquisitions, plaintiff was obtaining an alternate source of electricity to replace the one ComEd was supposed to provide. Obtaining temporary housing may be a step further removed, but the same concept applies. The residents of Deerfield were to obtain electricity for their abodes from ComEd. When ComEd allegedly failed to provide it, they were forced to find substitute places of residence. Moreover, unlike the earlier claims for compensation, these claims involve no damage to property and thus fall within the *Moorman* doctrine.

In light of the foregoing, the decision of the circuit court of Lake County dismissing plaintiff's complaint with prejudice is reversed. This cause is remanded to the trial court. On remand, the trial court is to stay the proceeding to allow the Commission to address this cause.

Reversed and remanded with directions.

ZENOFF, P.J., and McLAREN, J., concur.

SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING

JUSTICE HUDSON delivered the opinion of the court:

Plaintiff, the Village of Deerfield, has filed a petition for rehearing asserting that we misapprehended the *Moorman* doctrine (see *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 91 (1982)) in resolving this appeal. After reviewing the petition, we believe that our opinion requires clarification. It is true that a plaintiff may recover in tort for economic losses that accompany personal injury or property damage resulting from a sudden or dangerous occurrence. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 199 (1997). Further, as we pointed out, plaintiff did allege that it, or, more specifically, its class members, suffered property damages—food spoilage, for example (*In re Chicago Flood Litigation*, 176 Ill. 2d at 201 (holding that damages for loss of "perishable inventory as a result of interrupted electrical service" are recoverable in tort)). Thus, it would appear that plaintiff could recover economic damages because it has alleged property damages.

One concern remains, however. Plaintiff makes allegations on behalf of a class. Only class members who suffered property damage would be eligible to recover for items such as costs of temporary housing, generators, and battery-operated sump pumps. Plaintiff's complaint is quite general; for example, it alleges:

"As a result of [ComEd's] illegal conduct, customers (Plaintiff and Class Members) have incurred substantial damages and losses due to the unreliability of [ComEd's] service (*e.g.*, spoiled food, purchase of electrical generators to deal with [ComEd's] unreliable service, property damage, temporary housing, extra municipal and policing services necessitated by [ComEd's] power outages, *etc.*)."

Clearly, not every individual class member has experienced each and every articulated damage. The list, being prefaced by "*e.g.*," and followed by "*etc.*," is obviously intended to exemplify damages sustained by class members.

Only class members who have suffered property damage are entitled to proceed under the *Moorman* doctrine. As the supreme court has previously stated:

"Class plaintiffs complain that the application of the economic loss rule to the present case 'permits identically situated plaintiffs in the same case to be treated differently for recovery of their damages based solely on the fortuity that one may have suffered property damage along with economic damage.' However, the tort recovery requirement of injury to person or property is not a 'fortuity.' " *In re Chicago Flood Litigation*, 176 Ill. 2d at 199.

Accordingly, class members who experienced food spoilage or some other properly pleaded property damage may proceed, while those who suffered only economic losses are barred from recovery by *Moorman*. We do reiterate that conclusory allegations of property damage are not sufficient to avoid the *Moorman* doctrine. *In re Chicago Flood Litigation*, 176 Ill. 2d at 202 ("The conclusory allegation of unspecified property damage is insufficient to show that their damages are recoverable in tort, and cannot withstand a motion to dismiss"). Finally, we note that in its response to plaintiff's petition, defendant asks that we reconsider our ruling and hold that all of plaintiff's damages are barred by *Moorman*. This we decline to do. Defendant has not filed a petition for rehearing, and, in any event, we do not find persuasive its argument that plaintiff's property damages were simply the result of a disappointed expectation in continuous electrical service. See *In re Chicago Flood Litigation*, 176 Ill. 2d at 201 ("For example, in *Redarowicz*, the court held that plaintiff's property damage was caused by a construction defect, which was a disappointed commercial expectation. Thus, plaintiff's damages were solely

economic losses. However, the court indicated that had plaintiff suffered personal injury or other property damage, he would have been able to recover in tort"). We also note that defendant has filed a motion to file supplemental authority, namely, *Sheffler v. Commonwealth Edison Co.*, 399 Ill. App. 3d 51 (2010). We grant that motion. That case, as plaintiff points out, is not pertinent to the *Moorman* issue. It is, however, relevant to the issue of the trial court's jurisdiction, which was not addressed in the petition for rehearing. In any event, we have reviewed *Sheffler* and do not find it persuasive. More fundamentally, trial courts are courts of general jurisdiction and their jurisdiction flows from the constitution. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 335-36 (2002). We therefore question the notion that the legislature could remove from the jurisdiction of the trial court common-law tort and contract claims against ComEd. Indeed, even cast as a claim for reparations under the Public Utilities Act (see 220 ILCS 5/9—252 (West 2008)), recent case law suggests that jurisdiction might remain with the trial court. *Belleville Toyota, Inc.*, 199 Ill. 2d at 335-36 ("The legislature may create new justiciable matters by enacting legislation that creates rights and duties that have no counterpart at common law or in equity. *** The legislature's creation of a new justiciable matter, however, does not mean that the legislature thereby confers jurisdiction on the circuit court. *** Some case law, however, suggests that the legislature, in defining a justiciable matter, may impose 'conditions precedent' to the court's exercise of jurisdiction that cannot be waived. [Citations.] We necessarily reject this view because it is contrary to article VI [of the Illinois Constitution]").

ZENOFF, P.J., and McLAREN, J., concur.